UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Mara Sabinson,
        Plaintiff

        v.                                    Civil No. 05-cv-424-SM
                                              Opinion No. 2007 DNH ____
Trustees of Dartmouth College,
        Defendant

### O R D E R

Based upon a previous order (document no. 29), this case now consists of discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), discrimination and retaliation claims under the Age Discrimination in Employment Act ("ADEA"),[1] and a state-law claim for breach of contract. Before the court are plaintiff's motion to strike (document no. 59) and defendant's motion for summary judgment (document no. 32). Both motions are duly opposed. For the reasons given, plaintiff's motion to strike is denied, defendant's motion for summary judgment is granted as to plaintiff's federal claims, and the

---

[1] Plaintiff's complaint, which asserts a claim of discrimination based upon religion, sex, and age, does not actually cite the ADEA, but only refers to Title VII, which does not address age discrimination. Because both parties engage on the issue of age discrimination, the court will treat plaintiff's age-discrimination claim as having been raised under the ADEA.

court declines to exercise jurisdiction over plaintiff's claim for breach of contract.

## Motion to Strike

After properly notifying the court of its intent to do so, defendant replied to plaintiff's objection to summary judgment. Defendant's reply (document no. 57) included fourteen exhibits. Plaintiff moves to strike thirteen of them, arguing that they were filed in violation of Federal Rule of Civil Procedure 56 and Local Rule 7.1(e).

Plaintiff correctly points out that a reply memorandum is "restricted to rebuttal of factual and legal arguments raised in the objection or opposition memorandum," L.R. 7.1(e)(1), and contends that the rule's silence regarding attachments demonstrates that attachments are affirmatively prohibited.  In support of her argument, plaintiff cites Hartley v. Wisconsin Bell, Inc., 930 F. Supp. 349 (E.D. Wis. 1996), and Alford v. Cordele Foods, Inc., Civil Action No. 7:05-cv-887 (HL), 2007 WL 1545206 (M.D. Ga. May 24, 2007), neither of which, obviously, construes the local rule in this district.  For its part, defendant cites many cases from this district in which the court has considered exhibits attached to reply memoranda.

Defendant may submit attachments in support of its reply to plaintiff's objection to summary judgment.  Local Rule 7.1(e)(1) allows a party filing a dispositive motion to file a reply memorandum to rebut both factual and legal arguments made by the opposing party.  If Rule 7.1(e)(1) were limited to the rebuttal of legal arguments then, perhaps, plaintiff's argument would have some merit.  But to the extent the rule permits rebuttal of factual arguments, it must also permit the submission of additional factual material to support those arguments. Accordingly, plaintiff's motion to strike is denied.

**Motion for Summary Judgment**

1. Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial–worthy issue exists." Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)). "Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving

party to present evidence showing the existence of a trialworthy
issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39
(1st Cir. 2004) (citing Anderson, 477 U.S. at 248; Garside v.
Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  When ruling
on a party's motion for summary judgment, the court must view the
facts in the light most favorable to the nonmoving party and draw
all reasonable inferences in that party's favor.  See Lee–Crespo
v. Schering–Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir.
2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d
183, 185 (1st Cir. 2003)).


2. Background

The court notes at the outset that, unlike defendant, and
contrary to Local Rule 7.2(b)(2), plaintiff has not incorporated
into her memorandum "a short and concise statement of material
facts, supported by appropriate record citations."  Accordingly,
"[a]ll properly supported material facts set forth in
[defendant]'s factual statement [are] deemed admitted."  Id., cf.
Fontánez–Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir.
2006) ("This court has held repeatedly that the district court in
Puerto Rico is justified in holding one party's submitted
uncontested facts to be admitted when the other party fails to

4

file oppositions in compliance with local rules.") (quoting
<u>Torres-Rosado v. Rotger-Sabat</u>, 335 F.3d 1, 4 (1st Cir. 2003)).


Mara Sabinson was hired by Dartmouth College ("Dartmouth" or
"the College") in 1985 as an assistant professor in the theater
department, having previously served for one year as a visiting
assistant professor.  She was awarded tenure in 1991.  She served
as department chair for seven years, completing her most recent
term on June 30, 2002.  Her typical load included teaching acting
classes (Acting I, Acting II, and Acting III) and directing one
or more theatrical productions.


In December of 2000, Professor Margaret Spicer wrote to
Susan Pranger, the College's Provost, and Barry Scherr, Associate
Dean of the Faculty for the Humanities, to report on what she
termed "a serious and ongoing problem in the Drama Department."
(Def.'s Mot. Summ. J., Ex. 11, at 1.)  The problem was Professor
Sabinson's "negative behavior" (<u>id.</u> at 2), which Professor Spicer
characterized as "abrasive comments and [a] tendency to play
favorites" (<u>id.</u>) and an "inability to sustain positive supportive
relationships with most colleagues and many students" (<u>id.</u>).  The
letter went on to detail a number of incidents involving

Professor Sabinson and various students and colleagues.  In February of 2001, Dean Scherr received a lengthy e-mail critical of Professor Sabinson from Carl Choquette, an assistant technical director and master carpenter in the theater department.  (Def.'s Mot. Summ. J., Ex. 12.)

Professor Spicer's letter prompted an inquiry into Professor Sabinson's behavior by Dean Scherr and Edward Berger, Dean of the Faculty.  At the conclusion of their inquiry, Deans Scherr and Berger met with Professor Sabinson to discuss their concerns.  Dean Berger followed up with a letter in which he explained:

> The Drama Department is severely demoralized and there
> is a high level of acrimony, most of which is directed
> at you.  Quite frankly, I was surprised at the high
> level of anxiety that you have generated in your
> colleagues.  Letters from graduating seniors continue
> to cross my desk making very discouraging references to
> you and your behavior (e.g. "I have watched Mara
> Sabinson belittle and deride students.").  I have
> learned that these grievances go back to the 1980's and
> that former Dean Lahr did admonish you, in writing
> (February 8, 1989), for many of the same reasons that
> your situation has come to my attention.  I am,
> frankly, at a loss with regard to providing you
> guidance, so I have chosen to simply let my successor
> know about the situation and depend on his wisdom to
> seek reconciliation in a very damaged department.

(Def.'s Mot. Summ. J., Ex. 13.)

Berger was succeeded as Dean of the Faculty by Jamshed
Bharucha, and Scherr was succeeded as Associate Dean of the
Faculty for the Humanities by Lenore Grenoble.  In 2002, Dean
Grenoble recommended to Dean Bharucha that she, Dean Grenoble, be
appointed to serve as chair of the theater department, thus
placing the department in "receivership."  Dean Bharucha made the
appointment, effective July 1, 2002, at the conclusion of
Professor Sabinson's term as chair.  Dean Grenoble, in turn,
appointed Professor Spicer to serve as vice-chair.

After she stepped down as department chair, Professor
Sabinson spent the next academic year, 2002-03, on sabbatical
leave.  In preparation for the 2003-04 academic year, Dean
Grenoble informed Professor Sabinson that she would not be
teaching Acting III, the advanced acting course she had
traditionally taught.  Professor Sabinson initially objected, but
eventually acquiesced.  In preparation for the 2005-06 academic
year, Dean Grenoble, still acting as chair of the theater
department, informed Professor Sabinson that she would not be
scheduled to direct a theatrical production that year.

In 2004, Dean Grenoble determined that the theater
department would benefit from an intensive review.  After

7

soliciting names of people who might serve on a review committee from Professor Peter Hackett of the theater department[2] (Pl.'s Obj. to Summ. J. (document no. 46), Ex. F5), Dean Grenoble formed a committee comprised of Malcolm Morrison, Dean of the Hartt School of Music at the University of Hartford; Anne Torsiglieri, a professional actress; and Peter Saccio, the Leon D. Black Professor of Shakespearean Studies in the Dartmouth English department.  The committee spent two days on campus.  After meeting with students, faculty, and administrators, the committee held an exit interview with Dean Grenoble, Provost Barry Scherr, and the Dean of the Faculty, Carol Folt.  The review committee advised the three administrators of its concern that Professor Sabinson was having a "corrosive" effect on the theater department.

Subsequently, the committee produced a final report along with a separate cover letter, dated May 31, 2005, that dealt exclusively with Professor Sabinson.  That letter, signed by Dean Morrison, contained the following assessment:

---

[2] Professor Hackett joined the theater department during the 2003-04 academic year and became chair on July 1, 2005, replacing Dean Grenoble at the end of the department's receivership.

The committee was asked to consider the "quality and professional standing of the program faculty," and to consider whether the Department would be well advised to conduct "a search for a tenure track stage director, who is also capable of teaching some part of Acting, Directing, Voice, and Movement Curriculum."

It is clear to the committee that the Theater Department has suffered grievously from the presence of Mara Sabinson. Those interviewed, faculty and students alike, depict the corrosive influence of this professor. We heard various anecdotes of her harsh treatment of students both in class and (when she was directing) in rehearsal; of her unfavorable comments to students about the work and ideas of her colleagues; of her uncollegial behavior in Department meetings; of the threat she was felt to represent to junior and adjunct colleagues. We were told that during her 15-month sabbatical a welcome relief spread over the Department, but that since her return her continuing presence inhibits cooperation and discourages student enrollment. Every interviewee spoke (with varying degrees of tact) about this trouble within the department, some to the extent that the committee, in some interviews, thought it wise to curb the flow of grief so as to cover other topics. Reports of her past behavior remain current among the students, so that even those who came to Dartmouth lately try to avoid her. Professor Sabinson herself regards Dean Grenoble, who has chaired the department for the last three years, as her adversary; and it is commonly expected that when Dean Grenoble leaves the chair this July, Professor Sabinson will cause fresh difficulty by trying to re-claim her former position as a stage director and a leading member of the department. It is universally agreed that reform of the Acting curriculum is impossible so long as Professor Sabinson partakes of the discussion. Her uncooperativeness and contempt for her colleagues discourage even informal conversation about establishing a common curriculum. "Faculty can't talk," we were told. We note that Professor Sabinson's academic training and resume of professional work beyond Dartmouth fall beneath the standards expected by Dartmouth of its tenured faculty. Unusual talent and expertise might justify the employment of a person with

a substandard dossier and allow the toleration of a
difficult personality, but Professor Sabinson cannot
claim such excuses.

We see two solutions to this problem. (1) Professor
Sabinson should be persuasively offered a retirement
package.  The department would be relieved by her
departure; curricular work could resume in an
atmosphere of rational deliberation; a smoother path
would be created for a new hire in the Acting/Directing
area (the colleague who would be most threatened by
Professor Sabinson); students would no longer be shy of
taking certain courses. (2) She should be marginalized
to certain courses.  This arrangement, if adopted, must
be defined in writing to make it clear that it will
last until her retirement.  Department members remarked
that they didn't mind "paying her not to direct,"
though such a practice obviously has an unfavorable
impact on the Department's FTE budget.  We note also
that she has taught certain courses out of the
Department mainstream (Acting for the Camera, which has
a relation with Film and Television Studies) and
courses altogether outside the Department (in Women's
and Gender Studies).  Constructing her teaching load
largely of such courses would enable her to earn her
salary with some measure of self-respect.

(Def.'s Mot. Summ. J., Ex. 7.)


On June 3, 2005, Provost Scherr, Dean Folt, and Dean

Grenoble held a meeting, that they initiated, with Professor

Sabinson.  At the meeting, the three administrators discussed the

findings of the review committee and asked Professor Sabinson to

make a choice between taking a severance package or having her

teaching duties restructured.  Specifically, Professor Sabinson

was told that if she declined the severance package, she would

10

direct no productions and have her classroom assignments "narrowly defined." (Pl.'s Obj. to Summ. J., Ex. G2.) At the time of the meeting, Professor Sabinson's 2005-06 teaching schedule included Acting I, Acting II, and Acting for the Camera, as well as supervision of the Frost Play Festival. While the administrators did not indicate precisely what classroom assignments Professor Sabinson might be given, they told her that they were considering, in Professor Sabinson's words, "sending [her] over to the Writing Program," (id.), and that both the "no directing" and "narrow teaching" restrictions would not be altered (id.). Professor Sabinson concedes that none of the three administrators made any direct references to religion, sex, or age. She does allege, however, that one or more of them referred to the "culture" of the theater department, stated a belief that she did not fit into the culture of the department, and expressed a hope to change the culture of the department.[3] (Id.)

After Professor Sabinson returned to her office from the June 3 meeting, Professor Spicer stopped by to discuss a

---

[3] She also states, in her affidavit, that "it was specifically offensive to [her] when [Dean] Folt said 'why don't you take the money and go some place where you can be happy.'" (Def.'s Obj. to Summ. J., Ex. A1 (Sabinson Aff.) at 1.)

departmental matter.  Professor Sabinson, in turn, mentioned what
had happened at her meeting.  Professor Spicer responded by
suggesting that it might be time for Professor Sabinson "to find
[her] rabbi and start . . . a happy new life."  (Pl.'s Obj. to
Summ. J., Ex. A1 (Sabinson Aff.), at 2.)  As it happens, some
months previously, in a Dartmouth production, Professor Sabinson
had played the character of a Jewish academic who found happiness
after meeting a rabbi.  (Def.'s Mot. Summ. J., Ex. 36, at 228–
33.)

     On June 6, Professor Sabinson met with Ozzie Harris,
Dartmouth's Special Assistant to the President for Institutional
Diversity & Equity to discuss her situation, but she did not file
a grievance under the College's internal equal opportunity
grievance procedure.  On June 10, Professor Sabinson's legal
counsel wrote to the Dartmouth College Counsel, complaining that
Dartmouth had violated Professor Sabinson's rights as a tenured
professor and her civil rights under the law, and had
constructively discharged her.  Professor Sabinson did not,
however, file a complaint under the College's Agreement
Concerning Academic Freedom, Tenure and Responsibility of Faculty
Members ("Agreement Concerning Academic Freedom" or

"Agreement"),[4] did not invoke the faculty grievance procedure
outlined in the Handbook of the Faculty of Arts and Sciences and,
again, did not file a grievance under the College's internal
equal opportunity grievance procedure.

On August 8, Professor Sabinson filed a charge of
discrimination with the New Hampshire Commission on Human Rights.

On August 16, Dean Grenoble sent Professor Sabinson an e-
mail concerning her upcoming teaching assignments: "I have
reviewed the teaching possibilities for you for next year (05-06)
and would like to offer you the following courses: Acting for the
Camera and three first-year seminars, to be designed on the topic
of your choice."  (Def.'s Obj. to Prelim. Inj. Relief, Ex. A9.)
Professor Sabinson responded:

> I already heard from you as to my schedule for the
> current year by your e-mail of 11-18-2004 when you were
> chair of the department.
> You should pass your new thoughts on to the new
> chair.
> I regard your thought of courses outside the
> department to be the harassment which you promised if I
> did not accept your terms.

---

[4] The Agreement Concerning Academic Freedom is incorporated
into a larger document titled Organization of the Faculty of
Dartmouth College.

(Id., Ex. A10.)  Dean Grenoble, in turn, responded:

> While I have no expectation that I will change your
> perception of our relationship, I feel it is necessary
> to respond to your claims of "harassment."  When we met
> several months ago, I advised you that I would be in
> touch about a proposed teaching assignment for the 05-
> 06 academic year.  My email of yesterday was an effort
> to complete that effort. . . .  Furthermore, my
> proposal does not contain any reference to teaching
> outside the department.  "Acting for the Camera" and
> the "First Year Seminars" would all be Theater
> Department Courses . . . .

(Id., Ex. A8.)  As Professor Sabinson was considering topics for

her first-year seminars, Dean Grenoble made the following

suggestions: (1) American Political and Protest Theater of the

60's and 70's; (2) The Group Theater (1930-39); (3) The Great

Stage Directors; (4) Edward Albee; and (5) The Bread and Puppet

Theater.  (Def.'s Mot. Summ. J., Ex. 29, at 1-2.)  She also

invited Professor Sabinson to "think of ways of incorporating

performance into the courses."  (Id. at 2.)


    This suit followed.  In it, Professor Sabinson claims that

Dartmouth discriminated against her based upon her religion, sex,

and age, retaliated against her for failing to agree with the

demand that she either resign or accept an alteration to her

teaching assignments, breached her contract of tenured

14

employment, and denied her her contractual rights to academic freedom and due process.

3. Discussion

Defendant moves for summary judgment on all of plaintiff's claims.

A. Title VII

1. Discrimination

Plaintiff's Title VII discrimination claim is that defendant discriminated against her, as a Jewish female, by taking away her traditional directing duties and the acting courses she had taught for many years and assigning those teaching duties to male Christians.  Defendant argues that plaintiff's discrimination claim fails as a matter of law because she has produced no direct evidence of discrimination, cannot meet her prima facie burden under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and has not produced evidence sufficient to call into question the legitimacy of defendant's stated reasons for the actions it took.

Under Title VII, it is "an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Obviously, a plaintiff may prove a Title VII claim by using direct evidence of discrimination.  See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002) ("It is generally to an employee's benefit to show direct evidence of discrimination rather than relying on the inferential model set forth in McDonnell Douglas.")

Notwithstanding plaintiff's suggestion to the contrary, she has produced no direct evidence that her teaching duties were altered because of her religion or sex.  "Although its exact contours remain somewhat murky, the term direct evidence normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision."  Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 41 (1st Cir. 2002) (emphasis and quotations omitted).  That is, direct evidence is evidence that unambiguously implicates a discriminatory motive.  See Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002).  "A statement that can plausibly be interpreted two

16

different ways – one discriminatory and the other benign – does
not directly reflect illegal animus, and, thus, does not
constitute direct evidence." Id. (quoting Fernandes v. Costa
Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999).

Here, the only statement by a decisionmaker that plaintiff
identifies as direct evidence of discrimination is the statement
at the June 3 meeting that she did not fit into the culture of
the Dartmouth theater department.  That statement is more
plausibly interpreted in any number of other ways, depending upon
what characteristics a particular listener might think of as
defining the culture of the Dartmouth theater department.
Necessarily, many of those plausible interpretations are benign.
Therefore, the statement is, at worst, inherently ambiguous and,
thus, does not constitute direct evidence of discrimination.  See
Patten, 300 F.3d at 25 ("Our standard for direct evidence
requires statements that are not inherently ambiguous.")
(citation and internal quotation marks omitted).  In her
memorandum of law, plaintiff identifies other purported direct
evidence of discrimination, such as her colleagues' open
hostility toward her since the 1980s, an allegedly overtly anti–
Semitic production directed by Professor Hackett, and Dartmouth's

17

"history of racism, sexism, and anti-Semiti[sm]."[5]  But, because
none of plaintiff's other putative "direct evidence" bears upon
the contested employment decision, that evidence is not direct
evidence as the term is used in the Title VII context.

Because plaintiff has produced no direct evidence, it is
necessary to consider her claim under "the McDonnell
Douglas—Burdine—Hicks burden-shifting analysis."  Straughn v.
Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).  "Under
this analysis, the plaintiff must first establish a prima facie
case of discrimination."  Sher v. U.S. Dep't of Veterans Affairs,
488 F.3d 489, 507  n.19 (1st Cir. 2007) (parallel citations
omitted).  Here, the prima facie case plaintiff must establish is

---

[5] To demonstrate Dartmouth's history of racism, anti-
Semitism, and sexism, plaintiff has offered the affidavits of one
current and two former Dartmouth faculty members.  Former theater
professor Victor Leo Walker, II, who left Dartmouth in 2000,
discusses his belief that he was denied tenure as a result of
racism at Dartmouth and opines that Professor Sabinson was a
victim of anti-Semitism and/or sexism.  (Pl.' Obj. to Summ. J.,
Ex. A4.)  Music professor Jon Appleton presents an anecdote about
anti-Semitism at Dartmouth in the 1960s and opines  that he was a
victim of institutional anti-Semitism.  (Id., Ex. A2.)  And
former visiting associate theater professor Ronni Stewart: (1)
reports a comment by Professor Paul Gaffney, not a decisionmaker
in this case, that mentioned Jewishness; (2) characterizes a
production directed by Professor Hackett, another
nondecisionmaker, as anti-Semitic; and (3) opines that Professor
Sabinson was a victim of anti-Semitism.  None of these affidavits
contains direct evidence of religion- or sex-based discrimination
against Professor Sabinson.

this: (1) she belonged to a protected class; (2) she was performing her job in a way that rules out the possibility that her teaching duties were narrowed as a result of her job performance; (3) she suffered an adverse employment action; and (4) her former teaching duties were reassigned to instructors with roughly equivalent qualifications.  See Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st Cir. 1994)); see also Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005) ("Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case.") (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).

> After the plaintiff has established this prima facie
> case, "[t]he burden then must shift to the employer to
> articulate some legitimate, nondiscriminatory reason"
> for the adverse employment action.  McDonnell Douglas,
> 411 U.S. at 802.  If the defendant meets this
> requirement, the burden of production shifts back to
> the plaintiff, who must offer evidence showing that the
> defendant's proffered reason is pretext for
> discrimination.  Id. at 804.  While the McDonnell
> Douglas analysis thus shifts the burden of production,
> the burden of persuasion remains with the plaintiff at
> all times.  St. Mary's Honor Ctr. v. Hicks, 509 U.S.
> 502, 511 (1993).

Sher, 488 F.3d at 507 n.19 (1st Cir. 2007) (parallel citations omitted).

"[T]he prima facie case [is] a 'small showing,' that is 'not onerous,' and is 'easily made.'"  Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 30 (1st Cir. 2002)).  Here, plaintiff has demonstrated that she belongs to two protected classes, one based upon her religion, the other based upon her sex.  Regarding the third element of the prima facie case, the court will assume that giving plaintiff no theatrical production to direct and assigning her to teach Acting for the Camera and three first-year seminars in the theater department, as opposed to teaching the courses she traditionally taught, amounted to an adverse employment action for purposes of a Title VII discrimination claim.  See Rodriguez v. Bd. of Educ., 620 F.2d 362, 366 (2d Cir. 1980) (holding that transfer of art teacher from junior high school to elementary school was adverse employment action when teacher's "substantially uncontradicted evidence indicated that the art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs for middle school children").

Establishment of the second and fourth elements of plaintiff's prima facie case is not so easily recognized.  For one thing, plaintiff has not produced evidence that might rule out the possibility that her assignments were changed due to her poor job performance, if job performance is understood to include a professor's ability to cooperate effectively with students and colleagues in pursuit of common (or established) educational goals.  Plaintiff has also failed to produce any evidence regarding the qualifications of the persons who took over either her directing duties or the courses she once taught, which substantially limits her ability to establish the fourth element of the prima facie case.  Even so, given that the prima facie case is intended to impose only a light burden, see Kosereis, 331 F.3d at 213, the court will assume, for purposes of the following analysis, perhaps too generously, that plaintiff has established her prima facie case.

Moving to the second step of the McDonnell Douglas analysis, plaintiff concedes that defendant articulated a legitimate nondiscriminatory reason for its actions, namely the findings of the theater department review committee.  Accordingly, the burden shifts back to plaintiff to produce evidence showing that defendant's proffered reason for its actions is a pretext for

discrimination based upon her religion or sex.  That burden of

production "merges with the ultimate burden of persuading the

court that she has been the victim of intentional

discrimination."  <u>Texas Dep't of Comty. Affairs v. Burdine</u>, 450

U.S. 248, 256 (1981).  In comparison with the burden of

establishing a prima facie case, "[t]he pretext analysis . . . is

more demanding."  <u>Kosereis</u>, 331 F.3d at 213 (citation omitted).


To carry her burden of production, plaintiff must present

sufficient evidence to show both that defendant's articulated

reason for altering her teaching duties was a pretext and that

the true reason was discriminatory.  <u>See</u> <u>Straughn</u>, 250 F.3d at 34

(quoting <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 56 (1st Cir.

1999)); <u>see also</u> <u>Fernandes</u>, 199 F.3d at 581 (explaining that once

employer articulates legitimate nondiscriminatory reason for

adverse employment action, "the plaintiff must show both that the

employer's 'proffered reason is a sham, and that discriminatory

animus sparked [its] actions'") (quoting <u>Conward v. Cambridge</u>

<u>Sch. Comm.</u>, 171 F.3d 12, 19 (1st Cir. 1999)).  It is important to

note that pretext alone is not enough; "Title VII does not stop

[an employer] from demoting an employee for any reason – fair or

unfair – so long as the decision to demote does not stem from a

protected characteristic."  <u>Rodriguez-Cuervos v. Wal-Mart Stores,</u>

Inc., 181 F.3d 15, 22 (1st Cir. 1999) (citing Mesnick v. Gen.
Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)).  Here, plaintiff
has established neither pretext nor discriminatory animus.

"Pretext can be proven in several different ways."  Che v.
Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (citing
Santiago-Ramos, 217 F.3d at 55).  But "there is no 'mechanical
formula' for finding pretext."  Che, 342 F.3d at 39 (quoting
Feliciana de la Cruz v. El Conquistador Resort & Country Club,
218 F.3d 1, (1st Cir. 2000)).  Here, plaintiff points to the
following as evidence of pretext: (1) the comment made at the
June 3 meeting to the effect that she did not fit into the
"culture" of the theater department; (2) Professor Spicer's
suggestion, after the June 3 meeting, that she, Professor
Sabinson, find herself a rabbi; (3) the unreliability of the
theater department review committee's findings; and (4) the fact
that no other Dartmouth faculty member had ever been assigned the
number of freshman writing seminars she was assigned.[6]

_____

[6] A Title VII plaintiff may also demonstrate pretext by
showing that the employer's "nondiscriminatory reasons were
after-the-fact justifications, provided subsequent to the
beginning of legal action," Santiago-Ramos, 217 F.3d at 56
(citing Mariani Giron v. Acevedo Ruiz, 834 F.2d 238, 239 (1st
Cir. 1987); LEX K. LARSON, 1 EMPLOYMENT DISCRIMINATION § 8.04, at 8-76
(2d ed. 2000)), or by showing that "the employer gave 'different
and arguably inconsistent explanations' for taking the adverse

"The burden of persuasion on pretext may be met, <u>inter alia</u>, by showing that discriminatory comments were made by the key decisionmaker <u>or those in a position to influence the decisionmaker</u>."  <u>Straughn</u>, 250 F.3d 23, 35 (1st Cir. 2001) (citation and internal quotation marks omitted).  The comment about plaintiff not fitting into the "culture" of the theater department was arguably made by a key decisionmaker.[7]  And the comment is discriminatory in that it suggests the possibility of different employment decisions with respect to those employees who do fit into the culture of the theater department as opposed to those employees who do not.  But plaintiff has produced no evidence to support her assertion that the term "culture" should, or plausibly could, be interpreted, in the circumstances of this case, to refer to either her religion or sex.  Because the

_____

employment action,'" <u>McDonough v. City of Quincy</u>, 452 F.3d 8, 18 (1st Cir. 2006) (quoting <u>Domínguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 432 (1st Cir. 2000)).  Plaintiff does not advance either of those arguments, and because defendant identified the theater department review committee findings as the basis for its actions long before plaintiff filed suit, and has done so consistently, neither theory is relevant to plaintiff's case.

    [7] The record is somewhat unclear regarding who said what at the June 3 meeting.  However, in view of the obligation to construe the record in the light most favorable to plaintiff as the nonmoving party, the court will assume that the culture comment was made by a decisionmaker.

reference to culture upon which plaintiff relies is not
discriminatory in the context of her Title VII action, it is not
evidence of pretext.

Plaintiff's reliance upon Professor Spicer's rabbi comment
is similarly unavailing for at least two reasons.  First,
Professor Spicer was neither a key decisionmaker, nor was she in
a position to influence the decisionmaker.  Plaintiff asserts
that Dean Grenoble "[i]n significant part . . . relied upon the
antagonistic feelings of Professor Spicer, her Vice-Chair and
confidante."  But that conclusory assertion is not supported by
any actual evidence, much less evidence that Professor Spicer was
analogous to the "person in a position to influence the
decisionmaker" in Santiago-Ramos.  In that case, there was
evidence that the person upon whose discriminatory comments the
plaintiff relied was the plaintiff's direct supervisor, who held
almost daily conference calls with the decisionmaker, gave his
opinion on the contested employment action, and was involved in
the dismissal decision that prompted the plaintiff to file suit.
Santiago-Ramos, 217 F.3d at 55.  Here there is uncontested
evidence (see Def.'s Obj. to Prelim. Inj., Ex. A ¶ 20) that

Professor Spicer played no role in recommending or making the decision to alter plaintiff's teaching duties.[8]

Second, even if Professor Spicer had been in a position to influence a key decisionmaker, her rabbi comment does not communicate any bias against Jewish people in general, Jewish faculty members at Dartmouth, or plaintiff in particular.  More importantly, that comment is "not . . . significantly probative of pretext" because the record contains no "discernible indication that its communicative content . . . materially erodes the stated rationale for the challenged employment action." Straughn, 250 F.3d at 36.  That is, Professor Spicer's casual rabbi comment, whatever may have motivated it, says nothing about what a decisionmaker may have thought about Judaism or the fitness of Jewish people to direct productions or teach acting at Dartmouth or elsewhere.

Because it has no contextual relevance to Dartmouth's decision to change plaintiff's teaching duties, Professor Spicer's comment is fundamentally different from those of the

---

[8] Plaintiff's "evidence" of Professor Spicer's participation in the decision to alter her teaching duties is limited to her conclusory characterization of Spicer as Dean Grenoble's confidante.

decisionmaker in <u>Fernandes</u>, who told dark-skinned Cape Verdean former employees seeking to be rehired: "I don't need minorities . . . on this job," 199 F.3d at 579, and "I don't have to hire you locals or Cape Verdean people," <u>id.</u>  Evidence that a key decisionmaker said he did not have to hire Cape Verdean people materially erodes a claim that the decision not to hire was not based upon national origin.  Professor Spicer's rabbi comment – made after plaintiff was informed by the decisionmaker of the decision concerning her teaching duties – simply does not erode defendant's claim that the decision was made because of the rather drastic and decidedly negative conclusions of the review committee regarding plaintiff's performance as a faculty member. Rather, the rabbi comment was merely a statement by a non-decisionmaker that does not touch upon the reasons for the decision to narrow plaintiff's teaching duties and that casts no aspersions, either directly or indirectly, upon either the Jewish religion or those who practice it.

"Another way of demonstrating pretext is 'by showing that the employer's proffered explanation is unworthy of credence.'" <u>Che</u>, 342 F.3d at 39 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000)); <u>see also</u> <u>Straughn</u>, 250 F.3d at 35 (explaining that burden of persuasion on pretext may be sustained

by demonstration that "the proffered 'explanation [was] unworthy
of credence' in circumstances where the suspect denial, taken
together with other facts, suggests [a discriminatory]
motivation") (quoting Burdine, 450 U.S. at 256).  In Che, for
example, the proffered explanation determined to be unworthy of
credence was the defendant's claim that the plaintiff was
disciplined for violating a particular work rule, when there was
evidence that the rule upon which the defendant relied was not in
effect at the time of the alleged violation, thus demonstrating
"that the [employer]'s stated reason for [the employee's]
demotion was contrived."  342 F.3d at 39.

        This case would be analogous to Che if plaintiff had been
told that her teaching duties were being altered because of
negative comments from the review committee when, in fact, the
committee had made no negative comments.  But here, the review
committee's negative comments concerning plaintiff are detailed
and undisputed.  Plaintiff does not argue that defendant
mischaracterized the committee's findings but, rather, challenges
the accuracy of those findings.  Specifically, she contends that
the committee was necessarily biased against her, and its
findings suspect, because it consisted of allies of her long-time
enemies at Dartmouth, was given negative information and opinions

about her at the beginning of its visit to campus, failed to examine evidence that reflected positively upon her, and wrongly concluded that she was a poor teacher and director.  Plaintiff's argument misses the mark for several reasons.

First, if those who set up the review committee were plaintiff's enemies, and deliberately prejudiced the committee against plaintiff, that might be enough to establish pretext, but the only pretext that matters in the Title VII context is pretext masking discriminatory animus based upon a plaintiff's membership in a protected class.  See Rodriguez-Cuervos, 181 F.3d at 22. Here, plaintiff has produced no evidence to suggest that those responsible for altering her teaching duties harbored any animus against her based upon her religion or sex.

Second, in determining whether defendant's stated reasons for its actions are credible, the relevant question is not the accuracy of the review committee's findings.  Rather, "the 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Straughn, 250 F.3d at 41 (quoting Goldman v. First Nat'l Bank, 985 F.2d 1113, 1118 (1st Cir. 1993)).  As the court of appeals explained in Straughn, "the principal focus must be upon whether

29

. . . the responsible . . . decisionmakers, <u>reasonably believed</u>
that Straughn [the plaintiff] lied, <u>rather than whether she</u>
<u>actually lied</u>."  250 F.3d at 41; <u>see also</u> <u>Mesnick</u>, 950 F.2d at
824 ("It is not enough for a plaintiff merely to impugn the
veracity of the employer's justification; [she] must 'elucidate
specific facts which would enable a jury to find that the reason
given is not only a sham, but a sham intended to cover up the
employer's real motive: . . . discrimination [based upon religion
or sex].") (quoting <u>Medina—Munoz v. R.J. Reynolds Tobacco Co.</u>,
896 F.2d 5, 9 (1st Cir. 1990)).  Here, notwithstanding the
supportive student comments plaintiff has produced, and the
positive reviews of her productions, she has produced no evidence
that would call into question the reasonableness of defendant's
belief in the review committee's finding that she was a corrosive
influence in the theater department, and no evidence to suggest
that defendant gave an explanation it did not believe, or could
not reasonably have believed, in order to cover up a decision
actually based upon anti—Semitism or sex discrimination.  Without
such evidence, plaintiff cannot meet her burden of production.

A Title VII plaintiff may also prove pretext "by presenting
evidence of disparate treatment."  <u>Che</u>, 342 F.3d at 39 (citing
<u>Straughn</u>, 250 F.3d at 43—44; <u>Mesnick</u>, 950 F.2d  at 824).

Plaintiff's evidence of disparate treatment consists of testimony that, to the knowledge of one or more individuals, no other Dartmouth faculty member has ever been assigned as many freshman writing seminars as she was.  Even if that is true, it does not establish disparate treatment.

> It is fundamental that "[a] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects."  Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996).  The comparison cases need not be perfect replicas.  See Conward, 171 F.3d at 20.  Rather, the test is whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989).  Thus, in offering this comparative evidence, Rodríguez bears the burden of showing that the individuals with whom he seeks to be compared "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Rodriguez-Cuervos, 181 F.3d at 21 (emphasis added).  Here, plaintiff identifies no proposed analogues, no similar incidents, and no other protagonists similarly situated.  See Straughn, 250 F.3d at 37–38 (describing the kind of evidence necessary to establish disparate treatment that shows pretext).  This case does not present a situation such as that in Che, where the plaintiff was disciplined for a particular act, "writing on the

assignment block," while "there was documentary and testimonial evidence that other employees who wrote on the assignment block were not disciplined."  342 F.3d at 39.

That Dartmouth has never narrowed another professor's teaching duties in the way it narrowed Professor Sabinson's does not demonstrate disparate treatment.  Rather, to demonstrate disparate treatment, plaintiff would need to produce evidence that defendant did not take such action against a Christian or male faculty member after that faculty member had been the subject of a critique similar to the one directed at plaintiff by the theater department review committee.  Because she has produced no such evidence, plaintiff has not carried her burden of demonstrating pretext based upon disparate treatment.

In sum, plaintiff has not carried her burden of producing evidence showing that the reason given for the alteration of her teaching duties – the review committee's finding that she was a corrosive influence within the theater department – was a pretext intended to cover up a discriminatory reason.  Defendant has accurately characterized the committee's finding, and nothing suggests that Dean Grenoble did not reasonably believe that the committee's finding was accurate.  It would be a different matter

if plaintiff had produced evidence that the review committee had not found her to be a corrosive influence, or that Dean Grenoble did not believe the finding or could not reasonably have done so. But plaintiff has not produced any such evidence.

Notwithstanding the multiple avenues available for demonstrating pretext, plaintiff has failed to carry her burden of production on that issue, thus causing her claim to fail at step three of the McDonnell-Douglas paradigm.  She has also failed to produce evidence probative of actionable discriminatory animus on the part of any decisionmaker.

In her complaint, plaintiff identified Professor Spicer's "rabbi" comment as evidence of Dean Grenoble's anti-Jewish animus, and appears to have offered the administrators' culture comments as evidence of both religion-based and sex-based animus. Because, as stated, the rabbi comment was not made by a decisionmaker or a person in a position to influence a decisionmaker, and because plaintiff has produced no facts that would allow a reasonable jury to conclude that the culture comments pertained to either religion or sex, neither of those comments is sufficient to meet the burden of producing evidence of discriminatory animus.

33

Presumably in an attempt to show discriminatory animus, plaintiff devotes considerable attention to documenting both the history of animosity between herself and Professor Spicer, Professor Saccio, Dean Grenoble, and other perceived adversaries, and their alleged collusion against her.[9]  If plaintiff's burden were simply to produce evidence of animus against her, she would have carried her burden easily.  What she has failed to do, however, is produce any evidence – other than supposition and opinion – that the animus she has identified was based upon her religion or sex.  Moreover, plaintiff herself has identified at least one alternative basis for some of the animus against her; in her view, Professor Saccio, who she identifies as a long term antagonist, "hated her because he felt she had insulted his

---

[9] Plaintiff describes the collusion against her in the following way: (1) Professor Spicer has been her adversary since the 1980s, and conspired against her with Barry Scherr starting in 2000; (2) Dean Grenoble, a confidante of both Spicer and Scherr, became part of the plot when she placed the theater department in receivership in 2002; (3) subsequently, Grenoble hired Professor Hackett, who became chair of the department in 2005 and also, along with Spicer, staged an anti-Semitic production titled "Underpants"; and (4) when Grenoble established the theater department review committee, she made sure it would be biased against plaintiff by appointing another long-time antagonist, Professor Saccio, and two long-time friends of Hackett, and by providing the committee with negative information and opinions about her at the beginning of its review.

companion, Professor Steffensen, during his last illness."
(Pl.'s Obj. to Summ. J., at 7.)

Because plaintiff has failed to carry her burden of
producing evidence to demonstrate that defendant's reliance upon
the theater department review committee's findings as a basis for
altering her teaching duties was a pretext for religion- or sex-
based discrimination, defendant is entitled to judgment as a
matter of law on plaintiff's Title VII discrimination claim.

2. Retaliation

Plaintiff's Title VII retaliation claim is that defendant
retaliated against her by assigning her to teach Acting for the
Camera and three first-year writing seminars, on August 16,
approximately one week after she had filed a charge of
discrimination with the New Hampshire Commission on Human Rights
("HRC").  Defendant argues that plaintiff's retaliation claim
fails as a matter of law because Dean Grenoble decided to alter
plaintiff's teaching duties <u>before</u> plaintiff engaged in her
protected activity rather than afterward, thus making it
logically impossible for her to establish that Grenoble altered
her teaching duties in retaliation for plaintiff's having filed a
charge with the HRC.

35

Under Title VII, it is "an unlawful employment practice for
an employer to discriminate against any of [its] employees . . .
because [she] has opposed any practice made an unlawful
employment practice by this subchapter, or because [she] has made
a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing under this subchapter."
42 U.S.C. § 2000e-3(a).  Like traditional discrimination claims,
retaliation claims are subject to the McDonnell-Douglas burden-
shifting analysis.  See Pomales v. Celulares Telefónica, Inc.,
447 F.3d 79, 84 (1st Cir. 2006) (citing Ramirez Rodriguez v.
Boehringer Ingleheim Pharms., Inc., 425 F.3d 67, 84 (1st Cir.
2005)).

> To establish a prima facie showing of retaliation,
> a plaintiff must prove that (1) she engaged in
> protected activity; (2) an adverse employment action
> occurred; and (3) a causal link existed between the
> protected activity and the adverse employment action.
> Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003).
> An employee has engaged in an activity protected by
> Title VII if she has either opposed any practice made
> unlawful by Title VII, "or made a charge, testified,
> assisted, or participated in any manner in an
> investigation, proceeding, or hearing under [Title
> VII]." 42 U.S.C. § 2000e-3(a); see also Dressler, 315
> F.3d at 78.

Torres-Negron v. Merck & Co., 488 F.3d 34, 44 (1st Cir. 2007).

Here, plaintiff's filing of a charge of discrimination with
the HRC was unquestionably a protected act, and the court will
assume that the alteration of plaintiff's teaching duties was an
adverse employment action.  See Burlington No. & Santa Fe Ry. Co.
v. White, 126 S. Ct. 2405, 2411–16 (2006) (explaining that the
standard for establishing an adverse employment action is lower
for retaliation claims than it is for discrimination claims).
The parties engage on the issue of causation.

Defendant contends that the act that plaintiff claims to
have been retaliatory, the decision to narrow her teaching
duties, could not have been retaliatory because it took place
before plaintiff filed her charge of discrimination with the HRC.
Defendant also contends that plaintiff's retaliation claim is
procedurally deficient because she never filed a retaliation
claim with the HRC or the Equal Employment Opportunity
Commission.  Plaintiff counters that Dean Grenoble made not one
decision, but two: (1) the June 3 decision to threaten to alter
her teaching duties; and (2) the August 16 decision to carry out
the June 3 threat.

Plaintiff's argument is inventive but unavailing.  According
to plaintiff's own notes of the June 3 meeting, she was told that

the College intended to act on the committee's report and, if she did not accept a severance package, she would be given no directing assignments; her classroom assignments would be narrowed; and Dean Grenoble was considering having her teach writing courses.  She was also told that the narrowing of her classroom assignments was not subject to change; she was presented with no set of circumstances, no possible remedial action on her part, that would cause the Dean not to narrow her teaching duties.[10]  That the specifics of plaintiff's narrowed teaching load were not communicated to her until August 16 does not make the August 16 e-mail evidence of a second decision; it was merely the final expression of the June 3 decision.  Because the decision to narrow plaintiff's teaching duties took place prior to her protected activity, she has failed to produce evidence that establishes a prima facie case of retaliation.  See, e.g., Torres-Negron, 488 F.3d at 44 (holding that 1999 employment action could not be retaliation for protected activity performed in 2001).  Accordingly, defendant is entitled to judgment as a matter of law on plaintiff's Title VII retaliation claim.

---

[10] Plaintiff's complaint also characterizes the decision to narrow her teaching duties as having been made prior to the June 3 meeting.  (Compl. ¶ 17.)

38

B. ADEA

    1. Discrimination

Under the ADEA, plaintiff claims that her teaching duties were altered because of her age.  Defendant argues that plaintiff's age-discrimination claim fails as a matter of law because the only references to her age that plaintiff alleges came in the context of discussions of her eligibility for retirement.

Under the ADEA, it is "unlawful for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

"When an employee claims to have [suffered an adverse employment action] in violation of the ADEA, [she] must shoulder the ultimate 'burden of proving that [her] years were the determinative factor in [the employment action], that is, that [she] would not have [suffered the employment action] but for [her] age."  Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 15 (1st Cir. 2007) (quoting Mesnick, 950 F.2d at 823).  "The Supreme Court has developed a burden-shifting framework to facilitate the process of proving discrimination in

the absence of direct evidence."  Davila, 498 F.3d at 15 (citing

McDonnell Douglas, 411 U.S. at 802–05; Sanchez v. P.R. Oil Co.,

37 F.3d 712, 718–20 (1st Cir. 1994) (applying that framework in

an ADEA case).

> Under this analysis, a plaintiff establishes a prima
> facie claim of age discrimination by showing that: (1)
> [she] was at least 40 years old; (2) [she] met the
> employer's legitimate job performance expectations; (3)
> [she] experienced an adverse employment action; and (4)
> the employer had a continuing need for the services
> provided previously by the plaintiff.  See, e.g.,
> Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir.
> 2000).  The burden of production then shifts to the
> employer to put forth a legitimate, nondiscriminatory
> reason for the adverse job action.  Woodman v.
> Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995).
> Having done so, the final burden of persuasion rests
> with the employee to show, by a preponderance of the
> evidence, that the reason offered by the employer is
> merely a pretext and the real motivation for the
> adverse job action was age discrimination.  Id. at
> 1091–92.

Velazquez–Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir.

2007).

        As with the Title VII claim, the court will assume that

plaintiff has met her burden of establishing a prima facie case,

and plaintiff concedes that defendant articulated a legitimate

nondiscriminatory reason for the action it took against her.

Thus, the question becomes whether plaintiff has met her burden

of producing evidence to show that defendant's stated reason for
altering her teaching duties was a pretext for age
discrimination.

For the same reasons that defendant's explanation for the
action it took was not a pretext for discrimination based upon
religion or sex, it also was not a pretext for age
discrimination.  Moreover, the evidence of discriminatory animus
based upon age is even weaker than the evidence of discriminatory
animus based upon religion or sex.  Plaintiff's only evidence
that defendant gave her age any consideration at all is that her
age was mentioned during a discussion about whether her
retirement might amicably resolve the problems identified by the
theater department review committee.  Recognition of plaintiff's
age is simply not the same thing as discriminatory animus based
upon her age.  Cf. Pitasi v. Gartner Group, Inc., 184 F.3d 709,
715 (7th Cir. 1999) (holding, in case involving fifty-two old
employee terminated as part of a reduction in force, that "the
employer's 'suggestion of retirement would not alone give rise to
an inference of discrimination'" sufficient to constitute direct
evidence of discrimination) (citing Kaniff v. Allstate Ins. Co.,
121 F.3d 258, 263 (7th Cir. 1997); Halloway v. Milwaukee County,
180 F.3d 820, 827 (7th Cir. 1999)); Cox v. Dubuque Bank & Trust

41

<u>Co.</u>, 163 F.3d 492, 496 (8th Cir. 1998) (remanding for new trial when trial court in ADEA case declined to instruct jury that "neither the state nor the federal law prohibits an employer from asking the retirement plans of an employee if reasonable under the circumstances").

"Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." <u>Criley v. Delta Air Lines, Inc.</u>, 119 F.3d 102, 105 (2d Cir. 1997) (quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993)).  That concern is simply not implicated by the purported evidence of age-based discriminatory animus identified by plaintiff. Accordingly, defendant is entitled to judgment as a matter of law on plaintiff's ADEA discrimination claim.

2. Retaliation

Plaintiff also asserts an ADEA retaliation claim, but that claims suffers from the same infirmity as her Title VII retaliation claim: plaintiff's failure to produce evidence sufficient to meet the causation element of the prima facie case. Thus, defendant is also entitled to judgment as a matter of law on plaintiff's ADEA retaliation claim.

42

C. Breach of Contract

Plaintiff's breach of contract claim is vague and difficult to understand.  In the body of her complaint, she alleges:

> The group of three at the [June 3] meeting did not follow the ordinary rules and procedures of the College which require that "in order to protect academic freedom," the Dean of the Faculty shall discuss with Ms. Sabinson "allegations that adequate cause exists for disciplinary action."  Here, trampling academic freedom and procedural due process, required by College rules, the group did not claim that there were actual grounds for their threats other than Ms. Sabinson's "cultural differences."  Nor did the Dean of the Faculty discuss allegations with Ms. Sabinson prior to their decision to remove Ms. Sabinson.  The only point to the meeting was to coerce her resignation because of their distaste for her "cultural differences."

(Compl. ¶ 17.)  While the complaint does not expressly say so, plaintiff's allegations appear to refer to Section 5 of the Agreement Concerning Academic Freedom.  The complaint also alleges that "Ms. Sabinson had negotiated and agreed to four courses for the 2005-2006 academic year: Beginning Acting, Intermediate Acting, Acting for the Camera, and supervision of the Frost Play Festival," (Compl. ¶ 19), which at least suggests a claim that defendant breached an agreement with plaintiff by not allowing her to teach those four courses.  In that part of her complaint captioned "Claim," plaintiff asserts

43

> The group's action constitutes a breach of Ms.
> Sabinson's contract of employment as a tenured faculty
> member which protects her from this arbitrary malicious
> action and guarantees her academic freedom.  Their
> procedures consistently fail to follow the Dartmouth
> faculty handbook, which constitutes a portion of her
> contract.

(Compl. ¶ 28.)  Finally, in her prayer for relief, plaintiff

requests damages for "[b]reach of her contract of tenured

employment" and "[d]enial of her contractual rights to academic

freedom and due process."  (Compl. ¶ 31.)

Notwithstanding plaintiff's apparent references to her

contract of tenured employment as something separate from her

contractual rights to academic freedom and due process, plaintiff

has produced no evidence tending to establish or describe the

terms of her contract with Dartmouth, other than the Agreement

Concerning Academic Freedom and the Handbook of the Faculty of

Arts and Sciences ("Faculty Handbook"), and so her breach of

contract claim is necessarily limited to a claim that defendant

breached a duty it owed her arising under those documents.

Moreover, because the portion of the Faculty Handbook to which

both parties refer, titled "Faculty Grievance Procedure" (Pl.'s

Obj. to Summ. J., Ex. 26), pertains to "complaints regarding

faculty members," and this case involves no such complaint, the

Faculty Handbook appears to contain no contractual terms relevant to this case.

Thus, resolution of plaintiff's breach of contract claim will likely turn on whether defendant breached a duty it owed her under the Agreement Concerning Academic Freedom.  The Agreement provides, in pertinent part:

> 4.   If a member of the faculty alleges that his or her academic freedom has been violated, he or she may request of the Dean of the appropriate faculty that the Committee hear his or her complaint and consider his or her evidence.  If agreement on a mutually satisfactory disposition is not reached and the Committee finds the evidence warrants, the Committee shall refer the matter to the Council on Academic Freedom and Responsibility to proceed according to Section 5. . . .

> 5.   Both the Faculty and the Trustees acknowledge their obligation to uphold the standards of academic excellence and responsibility. Disciplinary action against a faculty member for unsatisfactory service thus requires cooperation between the Faculty and the Trustees and may be effected by the College only for adequate cause. Such action may include termination of an appointment with tenure, termination of a nontenured appointment before the end of its specified term, involuntary leave from College duties, or any other major changes in the conditions of employment that diverge from the ordinary agreements.
>      To show the existence of adequate cause for disciplinary action requires demonstration of the unfitness of the faculty member either in his or

> her professional capacity or in his or her
> behavior as a member of the Dartmouth community.
> <u>In order to protect academic freedom</u>, while at the
> same time serving the interests of the College as
> a community, <u>the following procedures will be used
> to determine</u> whether adequate cause exists for any
> disciplinary action and to recommend appropriate
> action to the Trustees:
>
>          . . . .

(Def.'s Mot. Summ. J., Ex. 25 (emphasis added).)  Section 5 goes

on to describe a formal hearing process that culminates in a

panel of the council presenting findings and recommendations to

the President of the College for transmission to the Trustees for

final action.  (<u>Id.</u>)


     Defendant argues that plaintiff's breach of contract claim

fails as a matter of law because: (1) the contested teaching

assignment did not violate any substantive right the plaintiff

enjoyed under her contract of employment; (2) the way in which

that assignment was imposed did not violate any procedural right

the plaintiff enjoyed under her contract; and (3) plaintiff

failed to invoke the administrative procedures available to her

under the very contract she claims defendant breached.


     Under the common law of New Hampshire, "[a] breach of

contract occurs when there is a '[f]ailure without legal excuse

to perform any promise which forms the whole or part of a contract.'"  Bronstein v. GZA GeoEnvironmental, Inc., 140 N.H. 253, 255 (1995) (quoting BLACK'S LAW DICTIONARY 188 (6th ed. 1990)).

Defendant's first and second arguments posit that, under plaintiff's employment agreement, Dartmouth owed her no duty to employ the Section 5 process before it altered her teaching duties, presumably because the "ordinary agreements" reserve the right to make teaching assignments to the College, and such changes are not considered "major changes in the conditions of employment."

"The interpretation of a contract is a question of law." Czumak v. N.H. Div. of Devt'l Servs., 155 N.H. 368, 373 (2007). The language used in the Agreement Concerning Academic Freedom does suggest that defendant must implement the procedures outlined in Section 5 before it may impose "[d]isciplinary action" on a faculty member, but it can also be plausibly construed differently – i.e., to mean that adequate cause is required before disciplinary action is imposed, but that the determinative process is only required if a faculty member contests the existence of adequate cause (there being no need for formal procedures when all agree that adequate cause exists).

47

Section 5 of the Agreement defines "disciplinary" action as including "any . . . major changes in the conditions of employment that diverge from the ordinary agreements."  The Agreement provides no guidance concerning what might constitute a "major change" in a faculty member's conditions of employment, or what the "ordinary agreements" are, divergence from which will transform a "major change" into a "disciplinary action." Plaintiff contends that the alteration of her course assignments was sufficiently dramatic to qualify as a "major change" in the conditions of her employment and, at least implicitly, that that major change diverged from the ordinary agreements.  On the surface, permanent reassignment of three courses plaintiff had traditionally taught, coupled with giving her no directing assignments, was a "change" and could even have been "major." But plaintiff has neither pled nor offered evidence of the terms of the referenced "ordinary agreements" that presumably govern her course assignments – the ordinary agreements from which a major change must have diverged in order to constitute disciplinary action.  In short, on this record, it would be quite difficult to construe the key contractual terms "major change" and "that diverge from the ordinary agreements."

Defendant also argues that even if it had an obligation to provide plaintiff with the procedure described in Section 5, her failure to invoke her rights under Section 4 provided it with a legal excuse for not implementing the procedures described in Section 5.  Plaintiff counters that while Section 5 is mandatory, Section 4 is permissive, thus excusing her failure to make a complaint to the Dean.  And, defendant suggests that the College always retains the right to assign and reassign specific teaching duties, implying that such reassignments either do not qualify as "major changes" in the conditions of a faculty member's employment, or, if they do, such changes do not diverge from the ordinary agreements.

Plaintiff's position seems somewhat contradictory.  She claims that defendant breached its contractual obligation by failing to provide the process outlined in Section 5 of the Agreement, notwithstanding that she could have triggered a Section 5 hearing simply by complaining that her academic freedom was being violated, under Section 4, which, by its terms, would have led to a Section 5 hearing.  That is, plaintiff is arguing that defendant breached its contract by failing to provide her with an administrative process that was available to her, and that she could have invoked, but did not.

49

Defendant points to Brennan v. King, 139 F.3d 258 (1st Cir.
1998), and O'Brien v. New England Telephone & Telegraph Co., 664
N.E.2d 843 (Mass. 1996), for the proposition that plaintiff's
failure to complain under Section 4 of the Agreement bars her
breach of contract claim, because before suing in court, she was
required to exhaust available administrative remedies.   In
O'Brien, the Massachusetts Supreme Judicial Court held:

> When a collective bargaining agreement provides a
> grievance procedure, the general rule is that the
> remedies specified in the agreement must be exhausted
> before an employee may resort to the courts.  See Vaca
> v. Sipes, 386 U.S. 171, 184 (1967); Balsavich v. Local
> 170, Int'l Bhd. of Teamsters, 356 N.E.2d 1217, [1219]
> ([Mass.] 1976) ("Employees may not simply disregard the
> grievance procedures set out in a collective labor
> contract and go direct to court for redress against the
> employer"); Norton v. Massachusetts Bay Transp. Auth.,
> 336 N.E.2d 854, [855] ([Mass.] 1975).  We see no
> justification for treating differently an employee
> asserting rights under a personnel manual that contains
> a grievance procedure where none of the limited
> exceptions to the exhaustion requirement, noted in the
> cited cases, applies.  See also Glover v. St. Louis–San
> Francisco Ry., 393 U.S. 324, 329–331 (1969).

664 N.E.2d at 849–50 (parallel citations omitted).  While the
reasoning of O'Brien is persuasive, New Hampshire's courts have
yet to establish a similar principle under this state's common
law.  The New Hampshire Supreme Court might well do so, but it is
not necessary to predict that result in the context of this case.

The preceding discussion simply reflects the many difficulties plaintiff faces in asserting a breach of contract claim under the circumstances as actually pled.  But this court need not attempt to fill in an inadequately developed record with respect to the contract claim, or predict what the common law of New Hampshire is likely to provide with regard to exhaustion of contractual administrative remedies, or construe the language of the Agreement in the absence of substantive and incorporated provisions (i.e., the "ordinary agreements").

Plaintiff's federal claims have been resolved, and resolution of her breach of contract claim will require a better developed record as well as determination and application of novel issues of state law, all better left to New Hampshire's courts, in the interests of comity and fairness to the parties.  See 42 U.S.C. § 1367(c)(1), (3); see also Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (identifying comity and fairness as factors to consider in determining whether to exercise supplemental jurisdiction).  As noted by the United States Supreme Court:

> Needless [federal] decisions of state law should be
> avoided both as a matter of comity and to promote
> justice between the parties, by procuring for them a
> surer-footed reading of applicable law.  Certainly, if

51

> the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the
> State claims should be dismissed as well.

United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (footnote

omitted).  Accordingly, this court declines to exercise

supplemental jurisdiction over plaintiff's breach of contract

claim.


### Conclusion

For the reasons given, plaintiff's motion to strike

(document no. 59) is denied; defendant's motion for summary

judgment (document no. 32) is granted as to plaintiff's federal

claims; and the court declines to exercise supplemental

jurisdiction over plaintiff's state-law claim for breach of

contract.  The clerk of the court shall enter judgment in

accordance with this order and close the case.


**SO ORDERED.**


Steven J. McAuliffe
Chief Judge


November 21, 2007

cc:  K. William Clauson, Esq.
     George E. Spaneas, Esq.
     Bruce W. Felmly, Esq.